**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| CHARLES ALCORN, SANDRA ALCORN, FRANCISCO MONTILLA, and CHARLES CHEJFEC, | ) ) ) | |
| | ) | Case No. |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| VILLAGE OF GLEN ELLYN, | ) | |
| | ) | |
| Defendant. | ) | |

**COMPLAINT FOR DECLARATORY RELIEF**

NOW COMES Plaintiffs Charles Alcorn, Sandra Alcorn, Francisco Montilla, and Charles Chejfec ("Plaintiffs"), pursuant to 28 U.S.C. § 2201, for their complaint against Defendant Village of Glen Ellyn, state as follows:

### I.      INTRODUCTION

1.      This case arises out of vindictive legislation that the Village of Glen Ellyn ("Village") passed for the purpose of prosecuting Plaintiffs over an inimitable property dispute involving the Village's water. Simply put, rather than pay a licensing or easement fee for the right to run its water through Plaintiffs' properties, the Village used a cram down ordinance as a cudgel forcing Plaintiffs to either pay thousands of dollars in maintenance, repair, and restoration costs of the water line carrying the Village's water or face a prosecution with remedies including exorbitant fines, automatic liens, mandatory foreclosure actions, and water being shut off to Plaintiffs' houses. However, the cram down ordinance, which serves as the basis for the Village's prosecution of Plaintiffs, violates the *Ex Post Facto* and the Takings Clauses in the United States Constitution. Therefore, Plaintiffs request that the Court declare unconstitutional the newly enacted ordinance.

## II.   PARTIES

2.     Plaintiffs Charles and Sandra Alcorn, husband and wife, are citizens of Illinois who reside at 637 Lake Road, Glen Ellyn, Illinois.

3.     Plaintiff Francisco Montilla is a citizen of Illinois who resides at 724 Crescent Boulevard, Glen Ellyn, Illinois.

4.     Plaintiff Charles Chejfec is a citizen of Illinois who resides at 732 Crescent Boulevard, Glen Ellyn, Illinois.

5.     Defendant Village of Glen Ellyn is an Illinois municipal corporation and derives its authority to enact ordinances through the Illinois Municipal Code, 65 ILCS 5/1-1 *et seq.*

## III.   JURISDICTION AND VENUE

6.     This Court has subject matter jurisdiction over the parties, pursuant to 28 U.S.C. §1331, because their dispute involves the constitutionality of Village Ordinance 7226.

7.     Venue is proper in the United States District Court for the Northern District of Illinois, pursuant to 28 U.S.C. §1391(b), because the events giving rise to Plaintiffs' claim occurred in this district.

## IV.   FACTS

### A.   The Pipe

8.     Plaintiffs Montilla and Chejfec share a property line, running in a north-south direction, that is approximately 230 feet long.

9.     According to the Village's water main map, a copy of which is attached as Exhibit 1, a water line pipe, approximately three to four feet beneath the surface and 1" in diameter, is located on Chejfec's property within inches of the east side of the property line between the properties owned by Montilla and Chejfec (the "Pipe").

10.     The Pipe is more than 250 feet long. Its path travels under an asphalt driveway, a concrete walkway, retaining walls, berms, trees, shrubs, bushes, landscaping, hardscaping, boulders, rocks, grass, and a fence. Some or all those objects would have to be excavated and restored if the Pipe ever required maintenance, repair, or removal. The cost of such maintenance, repair, and restoration work, even for a small section of the Pipe, could be tens of thousands of dollars.

11.     The Pipe starts in the parkway on Crescent Boulevard. It travels in a northwest direction until coming to a split where it connects to the east side of Montilla's house via a valve, which is denoted on Exhibit 1 with the following symbol: Ⓥ.

12.     After the split, the Pipe continues in the same northwest direction just east of the Montilla/Chejfec property line until it gets to the northwest corner of Chejfec's property.

13.     There, the Pipe crosses into the property owned by John Connor, who resides at 635 Lake Road, Glen Ellyn, Illinois 60137.

14.     The Pipe connects to the south side of John Connor's house via a valve, which is denoted with a Ⓥ symbol on Exhibit 1.

15.     The Pipe then continues east to Alcorns' property where it connects to the southwest corner of their house via a valve, again denoted with a Ⓥ symbol on Exhibit 1.

16.     Although much of the Pipe is located on Chejfec's property, the Pipe does not connect to Chejfec's house or serve any purpose on his property other than to carry the Village's water to his neighbors.

17.     The Pipe was installed prior to any of the Plaintiffs or John Connor acquiring their respective properties.

18.     Neither the Plaintiffs, Village, nor John Connor have any documents or other records indicating when the Pipe was installed or its composition. However, Plaintiffs believe the Pipe was installed in the 1950s or 1960s, and it is made of copper, galvanized steel, or lead.

19.     Additionally, there are no documents, recorded or otherwise, granting any party easement, licensing, or other rights to run the Pipe through the Plaintiffs' properties.

20.     Indeed, the Village admits that it does not have any easement, license, or other rights to run its water through the properties of any of the Plaintiffs or John Connor.

21.     Nonetheless, for at least 60 years, the Village has billed and generated revenue from the water it supplies to the lots now owned by the Alcorns, Montilla, and John Connor.

**B.      The Village's Inaction To Address The Leaking Pipe**

22.     In or about January of 2025, the Pipe suffered a failure, and water began percolating to the surface in the northwest corner of Chejfec's property. *See* Exhibit 1 (indicating location of the percolating water).

23.     On February 21, 2025, John Connor emailed the Village informing it of the leak and demanding that it require Chejfec to immediately repair the Pipe and pay for all repair costs.

24.     For the next four months, the Village did nothing to address the leaking Pipe despite later claiming that it was losing two gallons of water per minute and $11,000 annually.

25.     On June 25, 2025, the Village finally came to inspect the leak.

26.     Over the course of the next couple months, Village officials took little, if any, affirmative acts to address the leak. It simply wanted to repair the leak without addressing (a) the necessity of future repairs given the age and deterioration of the Pipe, (b) the Illinois Lead Service Line Replacement and Notification Act (415 ILCS 5/17.11), which mandates the replacement of the entire 250 feet of Pipe if any section of it contains lead, (c) the Village Building Code

-4-

which requires replacement of the 1" Pipe with a 1.5" pipe when new construction occurs on Plaintiffs' properties, (d) the scope of the repair work, including when it will occur and how long it will take, (e) the degree and quality of the restoration work on Plaintiffs' properties, and (f) indemnification and insurance issues related to any property damage or personal injuries during the repair work.

27.     In contrast, Plaintiffs requested on several occasions that the Village take full responsibility for the Pipe from which it has and will continue to profit from running its water through Plaintiffs' properties.

**C.     The Village Agrees To An Easement**

28.     On September 28, 2025, Village President Jim Burkett went to Chejfec's house to discuss a resolution that would resolve the legal and practical issues with the leaking Pipe.

29.     Chejfec advised President Burkett that he would allow the Village to tear up his driveway, landscaping, retaining walls, and any other obstacles to repair the Pipe but insisted that before any work begin that the Village enter into a written agreement with him (a) setting forth the duties and responsibilities of the Village for as long as the Pipe was located on Plaintiffs' properties, including any future maintenance, repair, replacement, and restoration work, and (b) indemnifying Plaintiffs for any work performed by the Village. Chejfec also insisted that the Village pay for the repair costs, as well as a fee to continue running its water through Plaintiffs' properties and for the diminution in value to Chejfec's property by a 240-foot easement.

30.     President Burkett was agreeable to all these terms, except the easement fee. Initially, Chejfec requested $100,000. President Burkett said there was "no way" he could agree because he did not have such authority, nor did he think others at the Village would accept it.

31. President Burkett then proposed that Chejfec's neighbors contribute to the easement fee.

32. Chejfec was adamant that he did not want the Village asking his neighbors for money.

33. Chejfec also insisted that the easement would only be with the Village because of the legal and practical issues of multiple easement holders and the increased possibility of future disputes.

34. Chejfec asked President Burkett what authority he had. Although President Burkett would not disclose his authority, he told Chejfec that $30,000 would be acceptable. Chejfec immediately agreed, and they shook hands on the deal (literally). Chejfec asked President Burkett to have the Village Attorney, Paul Stephanides, draw up the easement reflecting their agreement.

**D.     The Village's Enactment of Ordinance 7226**

35. Unbeknownst to Plaintiffs, at the time President Burkett was attempting to resolve the matter with Chejfec, the Village was planning legislation that would force all Plaintiffs to be jointly and severally liable for all maintenance, repair, and restoration costs of the Pipe.

36. On Friday, October 10, 2025, the Village buried a draft of a newly proposed law, Ordinance 7226, in its website portal along with numerous other matters that the Board intended to vote upon in two business days, October 14, 2025, which was the next scheduled Board meeting.

37. At no time before or during the posting of Ordinance 7226 did President Burkett, Village Attorney Stephanides, or any Village employee alert Plaintiffs to the legislation so they could discuss it with the Village or offer public comment at the Board meeting before the vote.

38. On October 14, 2025, the Village Board, without any discussion among themselves or input from any Village residents, including the Plaintiffs, unanimously passed Ordinance 7226.

A true and correct copy of Ordinance 7226 is attached as Exhibit 2. It became effective one day later, October 15, 2025, after being published in pamphlet form.

39.     Thus, in three business days, the Village proposed, passed, and enacted new legislation targeting Plaintiffs.

40.     On the same day that the Village passed Ordinance 7226, it also hand delivered a letter to Plaintiffs, except Chejfec, requesting a meeting on October 23, 2025 at 4:00 pm, to discuss "potential solutions and the timely resolution of the leak." *See* October 14, 2025 letter attached as Exhibit 3. Although the letter was hand delivered the afternoon of October 14, it omitted any reference to the Village Board meeting later that evening when the Village Board would vote on Ordinance 7226.

41.     The letter did, however, threaten Plaintiffs that their "water service may be shut off" if they could not reach a resolution by working "collaboratively" with the Village. *Id*. At the October 23 meeting, the Village Attorney and Village Manager Mark Franz, the two Village representatives at the meeting, never mentioned Ordinance 7226 nor disclosed its existence.

42.     Plaintiffs subsequently learned of the new legislation when Chejfec reached out to Village Attorney Stephanides asking for a draft of the easement.

43.     Mr. Stephanides informed Chejfec that the Village would not pay the $30,000 fee. Instead, it would only pay $15,000, and advised him that it had asked his neighbors to pay the other $15,000.

44.     Further, Mr. Stephanides disclosed that the Village had passed a new law, Ordinance 7226, which placed all financial responsibility for the Pipe and its water on Plaintiffs and John Connor.

45. Because of the Village's deceitful conduct, Chejfec advised Mr. Stephanides that he would not allow the Village to enter his property to perform any repairs and that he would not accept any resolution that involved his neighbors paying money or being a party to an easement. Having failed to achieve its objective, the Village ratcheted up its bullying tactics and threats.

**E.** **The Village Charges and Prosecutes Plaintiffs With Violating Ordinance 7226**

46. On January 2, 2026, the Village issued citations to all Plaintiffs and John Connor alleging that they violated Ordinance 7226 on June 25, 2025, which was nearly four months ***before*** the Village enacted Ordinance 7226. A copy of the Citations is attached as Exhibit 4. In other words, the Village sought to convict Plaintiffs of violating a law that did not exist at the time of the alleged offense.

i. Legal Consequences For Violating 7-10-20(B)

47. Specifically, the Citations allege that Plaintiffs violated 7-10-20(B) of Ordinance 7226, which states as follows:

> Service lines from the curb stop ~~of~~ to the water meter of the ~~premises~~ property being served shall be kept in good repair at all times, and ~~all repairs to the water pipe shall be made by and at the expense of either the owner of the property or the occupant receiving the service~~ the owner or occupant of the property receiving the water service and the owner of the property upon which any water line is in disrepair is located shall be jointly and severally responsible for the maintenance repair of the water line. Any maintenance and repair conducted by the Village of such a water service line pursuant to this section shall be at the cost of said owner or occupant of the property receiving the water service and the owner of the property upon which any water service line is located and shall be a lien upon such property which shall be subject to foreclosure by the Village.

*See* Exhibit 2 at 3.

48. Unlike its predecessor code provision, the above section of Ordinance 7226 attaches three new legal consequences not found in any previous Village law.

49. First, it creates joint and several liability, even if (a) the repair work does not occur on an owner's property, (b) a property owner does not have a right to go onto another owner's property to perform repair work, or (c) a property owner does not benefit from or otherwise use the waterline. *Id*.

50. Second, it creates an entirely new class of residents who are liable; namely, "the owner of the property upon which any water service line…is located" even if the property owner does not receive water from the waterline or other benefit from the waterline being located on the owner's property. *Id*.

51. Third, this section Ordinance 7226 operates as an automatic lien on Plaintiffs' properties and mandates that the Village foreclose on their homes to recover repair costs. *See id*. (stating that the cost of such maintenance and repair work "***shall*** be a lien upon such property which ***shall*** be subject to foreclosure.") (emphasis added).

ii. Legal Consequences Under 7-10-28(A) of Ordinance 7226

52. Once it establishes liability, the Village then seeks to punish Plaintiffs under Section 7-10-28(A) of Ordinance 7226, which provides, as follows: "(A) *Fine:* Any person, firm or corporation violating any provision of this chapter shall be fined in a sum not to exceed $500 $2,500.00 for each offense." *Id*. at 4.

53. This Section, unlike its predecessor, attaches the new legal consequence of raising the maximum fine from $500 to $2,500 a day, the largest single day fine in the Village's Municipal Code.

iii. Legal Consequences Under 7-10-28(B)

54. Further, Section B, the enforcement arm of Ordinance 7226, unlike any prior code provision, compels compliance through an injunction either requiring Plaintiffs to make repairs or authorizing the Village to trespass on Plaintiffs' properties and make repairs:

> (B) *Injunctive relief*: an administrative adjudication hearing officer or the Circuit Court, whichever the case may be, may enter an order enjoining any ongoing or repeated violation of any provision of this chapter or an order mandating compliance with any provision of this chapter or an order providing for any other injunctive relief causing the correction or remediation of any ongoing or repeated violation of any provision of this chapter.

*Id.*

### F.     Village Threatens To Shut Off Plaintiffs' Water For Violating Ordinance 7226

55. On January 6, 2026, the Village also sent a separate letter to Plaintiffs unequivocally advising them that their water will be shut off on January 16, 2026 at 1:00 pm: "The shutoff of service is scheduled for January 16, 2026 at approximately 1:00 pm." Attached as Exhibit 5 is the Village's January 6, 2026 shutoff letter.

56. The Village asserted that it was shutting off Plaintiffs' water based on a violation of Ordinance 7226, even though the adjudicative hearing was not scheduled for another eight days.

### G.     The *Ex Post Facto Clause*

57. Article 1, Section 10, Clause 1 provides that "[n]o State shall…pass any…ex post facto Law." The Supreme Court explained the meaning of the *Ex Post Facto* Clause in *Calder v. Bull*, 3 U.S. 386, 390 (1798): "the Legislatures of the several states, shall not pass laws, after a fact done by a subject, or citizen, which shall have relation to such fact, and shall punish him for having done it."

58. Here, Ordinance 7226 is being applied retroactively. The Village charged Plaintiffs with violating Ordinance 7226 on June 25, 2025. However, Ordinance 7226 did not become

-10-

effective until October 15, 2025, which is nearly four months after the date of Plaintiffs' alleged violations.

59.     Additionally, as set forth in paragraphs 48-55 above, it is undisputed that Ordinance 7226 attaches new legal consequences to the charged offense which did not exist before the enactment of Ordinance 7226.

60.     Therefore, because Ordinance 7226 is retroactive in its application or substance, it violates the *Ex Post Facto* Clause.

**H.      The Takings Clause**

61.     The Takings Clause in the Fifth Amendment states as follows: "nor shall private property be taken for public use, without just compensation." When interpreting the Takings Clause, the Supreme Court "has many times warned that one person's property may not be taken for the benefit of another private person without a justifying public purpose, even though compensation be paid." *See Thompson v. Consolidated Gas Utilities Corp.*, 300 U.S. 55, 80 (1937).

62.     Here, Ordinance 7226 violates the Takings Clause because it takes Plaintiffs' property, i.e., their money and property, through joint and several liability, for the stated public purpose of "establish[ing] certain rules and regulations concerning the Village's supply of water in the Village…" *see* Ex. 2 at 2, without just compensation. *See e.g.*, *Mountain Water Co. v. Montana Dept. of Public Service Regulation*, 919 F.2d 593 (9th Cir. 1990). Therefore, Ordinance 7226 is unconstitutional.

**COUNT I**
**(Declaratory Judgment)**

63.     Plaintiffs incorporate and reallege paragraphs 1-62 as if fully stated herein.

64.     In relevant part, 28 U.S.C. § 2201, provides that "In a case of actual controversy within its jurisdiction…any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration…"

65.     As set forth above, there is an actual controversy regarding the constitutionality of Ordinance 7226.

WHEREFORE, Plaintiffs respectfully request that the Court enter Judgment against Defendant (a) declaring that Ordinance 7226 is unconstitutional, and Plaintiffs cannot be charged with violating it, and (b) awarding Plaintiffs any other relief it deems is fair and just.

**<u>JURY DEMAND</u>**

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury.


Dated: January 27, 2026                                  ___/s/Charles Chejfec_____

Charles Chejfec
The Law Offices of Charles Chejfec
1431 Opus Place, Suite 600
Downers Grove, Illinois 60515
(630) 251-3035
charles@chejfeclaw.com